Matter of V.T. v A.S. (2025 NY Slip Op 50902(U))

[*1]

Matter of V.T. v A.S.

2025 NY Slip Op 50902(U)

Decided on May 29, 2025

Family Court, Kings County

Markoff, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 29, 2025
Family Court, Kings County

In the Matter of an Article 6 Visitation Proceeding V.T., Petitioner,

against
A.S. and D.S., Respondents.
In the Matter of an Article 8 Family Offense Proceeding A.S., Petitioner,
against
V.T., Respondent. 
In the Matter of an Article 8 Family Offense Proceeding A.S., Petitioner,
against
J.H., Respondent.

File No. 330141

The Law Firm of John Yacos, P.C., New York, for A.S. and D.S.
V.T. and J.H., pro se.

Robert A. Markoff, J.

Introduction
In these grandparent visitation and family offense proceedings, this Court considers the parents' motion to dismiss the maternal grandmother's petition seeking visitation with the subject children, and the motion of the maternal grandmother and maternal step-grandfather to dismiss the mother's respective family offense petitions against them. Resolution of the parents' motion to dismiss the grandparent visitation petition highlights the difficulty in applying precedent intended to reconcile tension between the public policy underlying New York's grandparent visitation statute (Domestic Relations Law § 72), and the fundamental rights of parents to make decisions about the care, custody, and control of their children. While the statute provides a legal mechanism for grandparents to petition a court to compel parents to arrange visitation between grandparents and grandchildren over the parents' objection, the Fourteenth Amendment guarantees parents the fundamental right to, inter alia, decide whether visitation with nonparents, including grandparents, is in their own children's best interests. To reconcile these principles, caselaw recognizes that on grandparent visitation proceedings, courts must apply a strong presumption that fit parents act in their children's best interests. Even so, caselaw does set forth how this presumption should be applied within the framework of the statute. For the reasons set forth herein, this Court determines that on a parents' motion for summary dismissal of a grandparent visitation petition under CPLR 3212, the parents meet their prima facie burden by providing well-founded objections to visitation, shifting the burden to the grandparent to raise a triable issue of fact on whether the parents' stated objections are mere pretext for personal acrimony rather than reflecting a genuine concern about the children's best interests. Here, the parents established prima facie entitlement to summary judgment dismissal of the grandparent visitation petition by proffering the reasons they object to visitation and by demonstrating, prima facie, that the maternal grandmother lacks standing under Domestic Relations Law § 72. In opposition to the parents' prima facie showing, the maternal grandmother failed to raise a triable issue of fact sufficient to either overcome the parents' well-founded objections to visitation, or to demonstrate that she has standing.
The Allegations
On September 19, 2024, the maternal grandmother V.T. filed a petition against the mother A.S. and the father D. S. (hereinafter "the parents") seeking visitation with the subject children C. (DOB XX/XX/2020) and L. (DOB XX/XX/2018). In her petition, the maternal grandmother alleges that it would be in the children's best interests to have visitation with her because she has spent "quality time" with L. when the mother transitioned into her new apartment; that she watched L. "24/7 for over four months" at the parents' home and even had L. at her own place of residence "for several weeks" when the mother was pregnant with C. The maternal grandmother alleges that the mother directed her to leave the parents' home and that "[L.] cried and wanted to come with me."
On January 30, 2025, the mother A. S. filed separate family offense petitions against the maternal grandmother and the maternal step-grandfather J. H. (together referred to as "the [*2]grandparents").[FN1]
The family offense petitions allege, among other things, that on September 18, 2024, the grandparents "stalked" the mother and L. outside their apartment and then confronted them on the sidewalk as they were on their way to L.'s school. The grandparents allegedly blocked the path of the mother and the child. The mother "repeatedly asked" the grandparents to let them pass, "but they refused and began yelling" at the mother that they had a right to see L. They screamed at L, "Don't you remember us, [L.]? We're your grandparents! Don't you remember puddle boots? Don't you want to go with Grandma and Grandpa?" L. was upset and crying. Bystanders eventually came and made a barrier around the mother and L. and asked the grandparents to leave. Even so, the grandparents followed the mother and L. for another four blocks until they reached the school gate. Once inside the school gate, the mother observed the maternal grandmother "looking directly" at her and smiling. According to the mother, the police were called, but the grandparents left before they arrived. The mother alleges that she reviewed the security cameras outside her home which revealed that, prior to the confrontation, the grandparents had been waiting and watching from across the street, observed the father leave the home with C., and then waited for the mother and L. to leave the home before proceeding to follow them.
Further, the mother alleges that in May 2021 she was "compelled" to terminate all contact with the maternal grandmother because of "emotional instability, abusive and neglectful behavior toward [her] and after learning that [the maternal step-grandfather] was a registered sex offender." The mother alleges that thereafter she received multiple unwanted text messages, direct messages through social media, and postcards, and that some of the messages "implied that they would take" the subject children from the parents.
The Motion to Dismiss the Grandparent Visitation Petition
In their motion to dismiss the grandparent visitation petition, the parents contend that the maternal grandmother lacks standing under Domestic Relations § 72 since both biological parents are alive, and there are no conditions existing in which equity would see fit to intervene to allow the maternal grandmother to petition for visitation. Additionally, the parents argue the petition should be dismissed because the undisputed facts evince that visitation would not be in the children's best interests.
In support of their motion, the parents submit their affirmations in which they each affirm, inter alia, that the maternal grandmother does not have a substantial relationship with the children. They affirm that the maternal grandmother has not seen the children in almost four years; that she did not request to visit the children at any time between May 9, 2021, and January 18, 2025; and that there was only "sporadic" contact between the parents and the maternal grandmother between March 2018 and May 2021 when the maternal grandmother lived in Minnesota, and the parents and children resided in New Jersey. The parents deny the maternal grandmother's allegation that she provided "24/7 childcare." In this regard, the parents assert that [*3]over an eight-week period in Spring 2019, the maternal grandmother assisted with childcare while the mother worked from home. During that period, the parents were present or nearby and oversaw the maternal grandmother's care. Additionally, the mother affirms that she provided compensation to the maternal grandmother in the form of food, lodging, and travel expenses.
The parents affirm that a conflict arose between the parents and the grandparents in May 2021, and that for next year there was a "complete cessation of contact." Thereafter, the grandparents allegedly sent "disparaging and threatening" postcards. According to the parents, L., age 7, has little memory of the maternal grandmother, and C., who was only 10 months old in May 2021, has no memory of her. The mother also asserts that on September 18, 2024, the maternal grandmother "physically assaulted [me] and L. in the street." Thereafter the mother filed a family offense petition, and this Court issued a temporary order of protection against the grandparents. Notably, the parents affirm that they were served with the maternal grandmother's visitation petition on L.'s birthday "causing further disruption and harassment" of their family.
In further support of their motion, the parents submit documentation evincing that in 1993 the maternal step-grandfather was convicted of criminal sexual conduct in the fourth degree, which is classified as a felony in the State of Minnesota, and that, as a result thereof, he must register as a sex offender. The parents submit a copy of a postcard addressed to the mother sent from Minnesota reading, "Thank you for showing me that you are the problem in this relationship. Thank you for inspiring me to more [sic] to see [L. and C.] they need someone sane in their lives." A text message from the maternal step-grandfather to the father reads, inter alia, "You'll reap what you sow." They submit a postcard addressed to L. and C. stating that, "Grandma's arm is doing much better. Your 529 college accounts are doing great. I'm taking pics of all your postcards so we can enjoy them later. Love you, Grandma and Grandpa." Another postcard addressed to the children states, "We are having a great time here. How is your map doing of our travels. You two are getting so Big. How school for you two? Love and miss you love Grandma and Grandpa." 
In opposition to the motion to dismiss her visitation petition and in support of her own motion to dismiss the family offense petition, the maternal grandmother submits personal statements from herself and the maternal step-grandfather. The maternal grandmother states that she and her husband sold their home and belongings to travel globally in August 2019. She states that she has never threatened harm to the mother or the children and denies ever being abusive to the mother. She states that in May 2021, the mother told her, "You are dead to me, and if you try to go down the hallway to say goodbye to L. and C., I will punch you in the face and if you send any cards, gifts or anything to the children, I will automatically throw it in the garbage." The maternal grandmother took the mother's threat seriously given her knowledge of alleged past violent incidents involving the mother.[FN2]

The maternal grandmother affirms that she had "quality time" with L. from 2018 to 2021. In this regard, she states that in 2019, she left Minnesota and put her business on hold to come assist the mother with childcare. She prepared breakfast and lunch most days, did laundry for L. [*4]and herself, and went grocery shopping. She even did house repairs, including resealing tile floors and landscaping. The maternal grandmother submits a statement and chart reflecting the amount of time she spent with L. for the first 3 ½ years of her life and C. for the first 11 months of her life. The statement summarizes the activities she did with L. during a four-month stay in either New York or New Jersey, and activities they did together in Virginia and Minnesota. The statement indicates that she came to visit when C. was born, and that the last time she saw C. was when she was 11 months old. As to C., the maternal grandmother states, "She has never known me and that hurts." The chart purports to reflect that between January 2018 and May 2021, the maternal grandmother spent a significant period with the children. She states that L. was "under [her] care" when, inter alia, the parents went on a "honeymoon to Africa, business trips, vacations and the [mother's] pregnancy with [C.]" The chart indicates that since May 2021, the parents have prohibited her from contacting the children.
The maternal grandmother submits a text message from the parents informing her that she has been blocked from their phones, and that she will not be receiving the parents' new home address. The message states, "I hope it was worth crashing our trip to bring your negativity, irrational behavior and as always drama; I wish you both the best and the medical/mental help you need-life isn't worth spending living in an echo chamber of anger and irrationally [sic]. We definitely will not be part of it and either will our children." The maternal grandmother also submits copies of cards that she sent to the children, including a 5th birthday card, a card from February 2024, and a card from December 2024. The card dated December 2024 and addressed to L. reads, in part, "Maybe someday your parents will let us talk and hug you again . . . Grandpa and Grandma love you very much and look forward to being with you again. We have never and will never forget about you!! You are deep in our hearts." The maternal grandmother also submits screenshots of various social media posts, to the effect that she has attempted to positively reach out to the mother by sending, inter alia, happy birthday wishes to the children and the mother.
In reply, the parents contend that the maternal grandmother's own papers evince that she has "zero ongoing relationship—much less a meaningful one—with the children." They argue that, due to an existing estrangement at that time, the maternal grandmother did not even reach out to the mother when L. was born, and that the maternal grandmother has not seen or spoken to the parents and children in nearly four years. The parents contend that even construing the grandmother's allegations in the light most favorable to her, the visits that she had with the children were "modest" in number and "sporadic."
The mother affirms that she had "initially hoped to foster a relationship" between the grandmother and L., but "over time, deeply concerning patterns emerged." She affirms that she witnessed "cycles of abuse and manipulation" that she herself experienced as a child and young adult, and that the grandmother's "emotional instability" manifested itself repeatedly. This "history of abuse" and the fact that the grandmother was married to a registered sex offender "compelled" the parents "to exercise [their] parental judgment and decline further contact between the [grandmother] and [their] children after May 2021," and that such decision was "not made lightly, but rather from a place of protecting [their] children from a demonstrably harmful environment." The mother further affirms that the children's lack of a relationship with the maternal grandmother has not "negatively impacted their life in any way" since, inter alia, they have "close and active relationships" with their three other grandparents, including both paternal grandparents and the maternal grandfather.
In her Reply to Affirmation to Dismiss Visitation and Restraining Order, the maternal grandmother asserts that video footage of the incident on September 18, 2024, supports her position that no family offenses were committed. She states that the reason she has not seen the children is solely due to the mother. The maternal grandmother requests a hearing and argues that the parents should bear the burden of proof.
By order dated March 17, 2025, this Court, pursuant to CPLR 3211(c), converted the parents' motion to dismiss under CPLR 3211 into a motion for summary judgment, and gave the parties an opportunity to submit additional papers pursuant CPLR 3211(c) and CPLR 409. Additionally, the Court gave the grandparents an opportunity to submit their proof, including their unaffirmed statements, in admissible form (see CPLR 2106).
In response to that order, the grandparents filed various items including, among other things, letters of support from friends and family, character reference letters, a list of dates with grandchildren, text messages, photos and emails. However, they did not, as directed, submit their unaffirmed statements in admissible form. 
In her Affirmation in Support of Converted Motion for Summary Judgment Dismissing Visitation Petition, the mother affirms, inter alia, that she and her husband's "decision to cease contact [with the maternal grandmother and maternal step-grandfather] was the rational, considered action of two fit parents focused solely on our children's best interest" and that the maternal grandmother "has not presented a good reason to disturb it." The mother affirms that the video footage of the September 2024 incident confirms that visitation would be contrary to the children's best interests because it shows the grandparents stalking and aggressively confronting the mother and L. The parents contend that the footage shows bystanders having to intervene to stop the grandparents from following them, and that the incident demonstrates the grandparents' poor judgment and disregard for the child's emotional and physical safety.
The Law of Grandparent Visitation in New York
"At common law, grandparents had no standing to assert rights of visitation against a custodial parent: a petition seeking such relief would necessarily have been dismissed" (Matter of Emmanuel S. v Joseph E., 78 NY2d 178, 180 [1991]). In 1966, the Legislature enacted Domestic Relations Law § 72 which conferred standing upon grandparents to seek visitation where the grandparents' child had died (see id.)
In 1975, Domestic Relations Law § 72 "was amended to allow standing not only where a parent had died, but also 'where circumstances show that conditions exist which equity would see fit to intervene'" (Matter of Emmanuel S. v Joseph E., 78 NY2d at 181). As noted by the Court of Appeals in the Matter of Emmanuel S. v Joseph E., the 1975 amendment "liberalized the law and granted all grandparents a right to seek standing that was no longer dependent upon the status of the parents" (id., at 182). The amended statute rested "on the humanitarian concern that 'visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild . . . which he [or she] cannot derive from any other relationship" (id., at 181, quoting Matter of Ehrlich v Ressner, 55 AD2d 953, quoting Mimkon v Ford, 66 NJ 426, 437; see also 1975 NY Legis Ann, at 51 [bill sponsor noting that grandparent visitation "could be of invaluable consequence to the children and ultimately the society"]).
In 1976, in Lo Presti v Lo Presti (40 NY2d 522 [1976]), the Court of Appeals explained that Domestic Relations Law § 72 is "not intended to give grandparents an absolute or automatic [*5]right of visitation," but that it was designed to "establish a procedural vehicle through which grandparents might assert that visitation of the child or children . . . is warranted" (id., at 526). There, the Court also noted that the existence of animosity between the grandparent and the party having custody of the child or children should not be the only factor considered in determining whether grandparent visitation is in the best interests of the child or the children because "it is almost too obvious to state that, in cases where grandparents must use legal procedures to obtain visitation rights, some degree of animosity" exists (id.)
In 1981, in People ex rel. Sibley v Sheppard (54 NY2 320 [1981]) the Court of Appeals recognized that New York's grandparent visitation statute implicated parents' constitutional rights under the Fourteenth Amendment to "raise their families as they see fit" (id., citing to Prince v Massachusetts, 321 US 158 [1944]; Pierce v Society of Sisters, 268 US 510 [1925]; Meyer v State of Nebraska 262 US 390 [1923]; People ex rel. Kropp v Shepsky, 305 NY 465 [1953]; Matter of Zorach v Causon, 303 NY 161 [1951], affd 343 US 306 [1952]). Even so, the Court held, inter alia, that grandparent visitation over the adoptive parents' objection did not unconstitutionally impinge upon the adoptive parents' rights "because the State, in its role as parens patriae, has determined that, under certain limited circumstances, grandparents should have continuing contacts with the child's development if it is in the child's best interest" (People ex rel. Sibley v Sheppard, 54 NY2d at 327). The Court of Appeals held that in determining whether an interference with the family relationship is proper, the action will not be reviewed under "exacting scrutiny, but according to a less rigorous standard of whether there is a 'reasonable relation to any end within the competency of the State'" (id., quoting Meyer v State of Nebraska, 262 US at 403).
A decade later, in 1991, in Matter of Emmanuel S. v Joseph E. (78 NY2d 178 [1991]), the Court of Appeals clarified that the 1975 amendment to Domestic Relations Law § 72 "liberalized the law and granted all grandparents a right to seek standing," and, as such, the law did not exclude from its provisions grandparents seeking visitation over the objection of fit parents in intact nuclear families (see id., at 182). The Court of Appeals explained, however, that the equitable circumstances standing provision is not intended to allow automatic standing but requires the court to examine all relevant factors, including the nature and extent of the grandparent-grandchild relationship and the basis of the parents' objection to visitation, before conferring standing upon a grandparent. In this regard, the Court stated:
"[Grandparents seeking visitation based upon equitable circumstances] must establish a sufficient existing relationship with their grandchild, or in cases where that has been frustrated by the parents, a sufficient effort to establish one, so that the court perceives it as one deserving the court's intervention. If the grandparents have done nothing to foster a relationship or demonstrate their attachment to the grandchild, despite opportunities to do so, then they will be unable to establish that conditions exist where equity would see fit to intervene. The evidence necessary will vary in each case but what is required of grandparents must always be measured against what they could reasonably have done under the circumstances" (id., at 182 [internal quotation marks omitted]).
The factors set forth in Matter of Emmanuel S. continue to guide New York courts in determining whether a grandparent has standing to petition for visitation based upon equitable circumstances (see Matter of Kushner v Askinazi, 209 AD3d 735, 736-737 [2d Dept 2022]; [*6]Matter of Kelly v Cairo, 198 AD3d 964, 964-965 [2d Dept 2021]; Matter of Noguera v Busto, 189 AD3d 1050, 1051 [2d Dept 2020]; Matter of Rodriguez v Concepcion, 188 AD3d 1217, 1217-1218 [2d Dept 2020]; Matter of Neilene P. v Lynne Q., 183 AD3d 1023, 1025 [3d Dept 2020]; Matter of Sands v Sands, 174 AD3d 628, 629-630 [2d Dept 2019]; Matter of Moskowitz v Moskowitz, 128 AD3d 1070, 1070-1071 [2d Dept 2015]).
In 2000, in Troxel v Granville (530 US 57 [2000]), the Supreme Court of the United States determined that a Washington State nonparent visitation statute violated parents' fundamental right guaranteed under the Due Process Clause of the Fourteenth Amendment to make decisions concerning the care, custody, and control of their children. A plurality of the Court determined that the Washington statute infringed on that right because it did not "accord the parent's decision any presumption of validity or any weight whatsoever" (id., at 67). The plurality found that under the Washington statute a court could "disregard and overturn a decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests" (id., at 67). The plurality stressed that there is a "presumption that fit parents act in the best interest of their children" (id., at 68), and therefore "so long as a parent adequately cares for his or her children (i.e. is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children" (id., at 68-69).
In Troxel, the plurality rejected the notion that a state's public policy supporting nonparent visitation, including grandparent visitation, was, alone, sufficient to override a parents' rights under the Due Process Clause (see id., at 71-72). The plurality opinion stated that "the decision whether an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision [denying visitation] becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination" (id., at 70). Even so, the plurality declined to "define the precise scope of the parental due process right in the visitation context" recognizing that "state-court adjudication in this context occurs on a case-by-case basis" (id., at 73). In this regard, the plurality was also cognizant that the burden on the parents in litigating a visitation dispute, including financial costs, may be "so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated" (id., at 75).
In 2007, in Matter of E.S. v P.D. (8 NY3d 150 [2007]), the New York Court of Appeals considered facial and as-applied constitutional challenges to Domestic Relations Law § 72 in the aftermath of Troxel. The Court of Appeals determined that New York's statute was facially constitutional because it "'can be, and has been, interpreted to accord deference to a parent's decision, although the statute itself does not specifically require such deference'" (id., at 159, quoting Matter of Hertz v Hertz, 291 AD2d 91, 94 [2d Dept 2002]). The Court of Appeals determined that it was appropriate to interpret the statute as encompassing "the constitutional protections necessary to safeguard parental rights," as other states, including Pennsylvania, Utah, and Massachusetts had done (see id., at 160). According to the Court, the statute is facially sufficient under Troxel because New York courts give "'some special weight to the parent's own determination"' (id., quoting Matter of Hertz v Hertz, 291 AD2d at 94).
The Court of Appeals reiterated the rule that under Domestic Relations Law § 72 "the [*7]court must undertake a two-part inquiry: 'First, [the court] must find standing based on death or equitable circumstances'; and '[i]f [the court concludes that the grandparents have established the right to be heard, then it must determine if visitation is in the best interest of the grandchild'" (Matter of E.S. v P.D., 8 NY3d at 157, quoting Matter of Emanuel S., 78 NY2d at 181). The Court implied that in applying the two-part inquiry "courts should not lightly intrude on the family relationship against a fit parent's wishes," and that "the presumption that a fit parent's decisions are in the child's best interests is a strong one" (id.) 
Addressing the as-applied constitutional challenge, the Court of Appeals emphasized that the trial court had, in fact, "employed the strong presumption that the parent's wishes represent the child's best interests, as our statute requires" (Matter of E.S. v P.D., 8 NY3d at 160 [emphasis added]), and that the grandparent there had surmounted the "high hurdle" of the presumption with evidence that she was the child's de facto "surrogate, live-in mother" from the time the child was almost 4 years old until he was 7 years old (id.) Critically, there, the grandparent had automatic standing based upon the death of the mother (see e.g. Matter of Corey W. v Robin G., 213 AD3d 677 [2d Dept 2023] [death of parent provides grandparent with "automatic standing to seek visitation"]).
In the aftermath of Troxel and Matter of E.S. v P.D., caselaw makes clear that regardless of whether a grandparent's standing is based upon the death of a parent or equitable circumstances, the court must apply a strong presumption that the parents' wishes represent the child's best interests (see Matter of E.S. v P.D., 8 NY3d at 160 [applying presumption where standing based upon death of parent]; Matter of Fitzpatrick v Fitzpatrick, 137 AD3d 784 [2d Dept 2016][considering presumption where standing based upon equitable circumstances]; Matter of Vandenburg v Vandenburg, 137 AD3d 1498 [3d Dept 2016] [considering presumption where standing based upon equitable circumstances]).
Even so, neither the statute nor caselaw delineate the process for a grandparent to overcome the "strong presumption." Indeed, the caselaw suggests that the manner and weight accorded to the wishes of parents are determined on a case-by-case basis (see Matter of E.S. v P.D., 8 NY3d at 160). Given that the constitutionality of Domestic Relations Law § 72 depends upon the courts applying a strong presumption in favor of the parents' position, grandparents must overcome that presumption before any court may consider whether visitation over the parents' objection is in the child's best interests.
Analysis
"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Winegrad v New York Univ. Med. Center, 64 NY2d 851, 853 [1985]). "Once this showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (Alvarez v Prospect Hosp., 68 NY2d at 574; Winegrad v New York Univ. Med. Center, 64 NY2d at 853). "The rule with respect to defeating a motion for summary judgment, however, is more flexible, for the opposing party, as contrasted with the movant, may be permitted to demonstrate acceptable excuse for his [or her] failure to meet the strict requirement of tender in admissible form" (Zuckerman v City of New York, 49 NY2d 557, [*8]597-598 [1980]).
Here, in considering the parents' motion for summary judgment dismissal of the grandparent visitation petition, the Court must employ the "strong presumption" that the parents' decision to deny visitation represents the children's best interests (see Matter of E.S. v P.D., 8 NY3d at 160).[FN3]
In so doing, this Court holds that the parents meet their prima facie burden on summary judgment by providing well-founded objections to visitation, shifting the burden to the grandparent to raise a triable issue of fact on whether the parents' stated objections are mere pretext for personal acrimony rather than a genuine parental judgment about the children's best interests]; see generally Matter of Liebling v Prussman, 235 AD3d 872, 873 [2d Dept 2025][applying presumption that a fit parent's decisions are in the child's best interests, and finding that father's objections to visitation were well founded]; Matter of Teresa S. v Christopher H., 233 AD3d 691, 692 [2d Dept 2024] ["The record established that the parents' objections to visitation were well founded" because "[t]he grandmother engaged in conduct that showed that visitation was not in the best interests of the children"]; Matter of Marchant v Marchant, 185 AD3d 1035, 1036 [2d Dept 2020]).
Here, the mother affirms that she opposes visitation with the maternal grandmother because as a child and young adult, the mother endured "cycles of abuse and manipulation" and witnessed the maternal grandmother's emotional instability. The mother states that at the time of L.'s birth, she had been estranged from the maternal grandmother. Even after re-establishing contact after L.'s birth, the mother and maternal grandmother again became estranged, and have not had contact since 2021. As such, the children have had no contact with the maternal grandmother for nearly four years.
Additionally, the parents object to visitation because the maternal grandmother is married to a registered sex offender. The parents explain that after nearly four years of no contact, the grandparents stood outside the parents' home, followed them, and then precipitously confronted the mother and L. while they were on their way to L.'s school. According to the mother, such actions evinced poor judgment and risked the physical and emotional wellbeing of L., who was visibly upset by the incident.
Based upon the foregoing, the parents demonstrate, prima facie, that the acrimony, estrangement and familial dysfunction between the parents and the maternal grandmother support the parental decision to deny visitation in the best interests of the children (see Matter of Wilson v McGlinchey, 2 NY3d 375, 382 [2004]["We therefore determine that the child's best interest is advanced by shielding her from the animosity and dysfunction between the parents [*9]and grandparents . . . "]; Matter of Sands v Sands, 174 AD3d 628, 630 [2d Dept 2019] [recognizing that animosity coupled with family dysfunction may provide a basis for denying visitation]; Matter of Gray v Varone, 101 AD3d 1122, 1123 [2d Dept 2012][same]; see also Matter of Liebling v Prussman, 235 AD3d at 873 [dismissing grandparent visitation petition because parents' objections to visitation were well-founded]).
Additionally, the parents establish, prima facie, that equitable considerations do not warrant judicial intervention to confer standing upon the maternal grandmother (see Domestic Relations Law § 72[1]; see Matter of Poznik v Salkin, 214 AD3d 663, 664 [2d Dept 2023]). The parents demonstrate, prima facie, the lack of an ongoing relationship between the maternal grandmother and the children. The maternal grandmother last had contact with the children nearly four years ago when L. was 3 ½ years old and C. was less than a year old. The mother affirms that L. has only faint memory of the maternal grandmother and C. has no memory of her (see Matter of Kushner v Askinazi, 209 AD3d at 737 [no standing where grandparent last saw child four years prior and did not take steps to contact the grandchildren during that time period]; Matter of Marchant v Marchant, 185 AD3d at 1036 [no standing where grandparent had "almost no contact or communication [with children] for several years before the hearing and [grandparent] acknowledged that he no longer had a relationship with them"]). As such, the burden shifts to the maternal grandmother to tender evidence sufficient to raise triable issues of fact regarding the parents' stated reasons for objecting to grandparent visitation, and on the issue of whether equity would see fit to intervene to confer standing. 
In opposition, the maternal grandmother fails to raise a triable issue of fact. Initially, notwithstanding this Court's order dated March 17, 2025, the maternal grandmother fails to render much of her evidence in admissible form. Rather, the maternal grandmother filed various other items and statements which, again, were mostly not in admissible form.
Even excusing this failure to tender evidence in admissible form, the Court finds that the maternal grandmother's submissions fail to raise a triable issue of fact. The maternal grandmother denies, in conclusory fashion, the mother's allegation that she abused the mother. The maternal grandmother states that she has never threatened harm to the mother or the subject children. She admits, however, that there has been an estrangement since 2021 but does not provide any context for the estrangement other than that the mother told her in May 2021 that she is "dead" to her and directed her to leave the parents' home without saying goodbye to the children. None of the parties provide any details about specific incidents leading up to the estrangement in May 2021, or the estrangement that existed before the birth of L. Even so, given the presumption in favor of the parents' decision, it is incumbent on the maternal grandmother to set forth with admissible evidence the factual circumstances giving rise to the estrangement and cause of familial dysfunction to raise a triable issue of fact.
The maternal grandmother does not dispute that the maternal step-grandfather is a registered sex offender. She does not deny that the maternal step-grandfather accompanied her in September 2024 during the confrontation with the mother and L. The maternal grandmother does not deny that she has allowed the maternal step-grandfather to interact with the children notwithstanding the parents' objection. Overall, the maternal grandmother fails to raise an issue of fact as to whether the parents' objections to visitation are mere pretext or a genuine parental judgment about the children's best interests, and therefore, fails to overcome the presumption that the parents' decision comports with the children's best interests. 
Additionally, even assuming that the maternal grandmother spent a significant amount of time with L. in 2021 as set forth in a chart that she submitted, it is undisputed that she has not maintained a relationship with L. or ever established any relationship with C. The maternal grandmother's love and affection towards the children is insufficient to raise a triable issue of fact (see Emmanuel S. v Joseph E., 78 NY2d at 182; Matter of Noguera v Busto, 189 AD3d 1050, 1051 [2d Dept 2020]).
Caselaw recognizes that where parents have frustrated the establishment of a relationship between the children and a grandparent, the grandparent need only demonstrate a sufficient effort to establish a relationship, which is measured by what reasonably could have been done under the circumstances (see Matter of Emmanual S. v Joseph E., 78 NY2d at 182; Matter of Kushner v Askinazi, 209 AD3d at 737; Matter of Rodriguez v Concepcion, 188 AD3d at 1218; Matter of Sands v Sands, 174 AD3d at 629). However, the notion that a nonparent has a statutory right to establish a relationship with a child over the objection of both fit parents is constitutionally dubious under the rationale set forth in the plurality opinion in Troxel v Granville (530 US 57) and thereafter adopted by the Court of Appeals in Matter of E.S. v P.D., both of which were decided after Matter of Emmanual S. 
Even so, the content of the grandparents' cards, letters, and social media posts directed towards the parents and the children does not evince a sufficient reasonable effort to rehabilitate and/or establish a relationship with the children to raise a triable issue of fact. Given the totality of circumstances, including the parents' objections to visitation, the incident in September 2024, and the lack of any contact with the grandchildren for nearly four years, the maternal grandmother's efforts to reach out to the children through cards, letters, and social media posts are, under the circumstances, insufficient to raise a triable issue of fact.
"A hearing to determine the issue of standing is not necessary where there are no triable issues of fact raised in the submitted papers" (Matter of Poznik v Salkin, 214 AD3d at 664[internal quotation marks and citations omitted]; Matter of Sands v Sands, 174 AD3d at 630).
Accordingly, the parents' motion seeking dismissal of the maternal grandmother's visitation petitions (V-21284-24; V-21285-24) is GRANTED. 
The Motion to Dismiss the Family Offense Proceeding
The grandparents fail to establish, prima facie, entitlement to summary judgment dismissal of the mother's family offense petitions against them. The detailed allegations in the petition, the video footage of the September incident, and the maternal grandmother's affirmation evince that there exist triable issues of fact whether the grandparents committed the family offenses of, inter alia, harassment in the second degree (Penal Law § 240.26[2]), disorderly conduct (Penal Law § 240.20[7]), and stalking in the fourth degree (Penal Law § 120.45 [1], [2]). In light of this determination, this Court need not consider the sufficiency of the parents' opposition papers (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]).
Accordingly, the motion of the maternal grandmother and maternal step-grandfather seeking dismissal of the mother's respective family offense petitions against them is DENIED.
Conclusion
The motion of the parents seeking dismissal of the maternal grandmother's visitation is [*10]GRANTED, and those petitions are DISMISSED with prejudice. The motion of the maternal grandmother and maternal step-grandfather seeking dismissal of the mother's separate family offense petitions against them is DENIED.
PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.
Dated: May 29, 2025
ENTER
Robert A. Markoff, J.F.C.

Footnotes

Footnote 1:The mother previously filed family offense petitions against the maternal grandmother and maternal step-grandfather on September 18, 2024, which was the date of the subject incident. Those petitions were dismissed without prejudice based upon the mother's failure to appear in court on January 6, 2025. 

Footnote 2:As evidence of the mother's past violence, the maternal grandmother submits proof that the mother pleaded guilty to disorderly conduct in Minnesota arising out of an incident with a police officer and asserts that in 2017 the mother was charged with committing assault against the father.

Footnote 3:There is a meaningful distinction between giving a fit parent's objection to grandparent visitation the effect of a legal presumption versus merely giving it special weight. A presumption is a "rule of law that requires courts to draw a certain inference from particular facts, or from particular evidence, unless and until the truth of such inference is disproved" (Ulrich v Ulrich, 136 NY 120, 123 [1892]; Guide to NY Evid rule 3.01, Presumptions in Civil Proceedings, 
https://nycourts.gov/judges/evidence/3-presumptions/Article3-presumptions-PF.shtml [last accessed May 28, 2025]; Black's Law Dictionary [11thed 2019], presumption). If the fit parent's objection to grandparent visitation is given the effect of a presumption, then the grandparent challenging that presumption bears the initial burden of submitting sufficient evidence to overcome the effect of the presumption before the court would direct a best-interests hearing.